The next case on our call this morning, agenda number five, is number 130286. People of the State of Illinois v. Casey R. Hagestedt. Counsel for the appellant, are you prepared to proceed? Good morning, your honors. Counsel, may it please the court. My name is Andrew Moore, and I represent Casey Hagestedt in this matter. The questions presented for this court are best encapsulated by the dissent below, when Justice McClaren asked, In this case, we have a police officer in the kitchen of a mad's home during the mid-morning hours, shining a flashlight into a one-inch opening in a padlocked and chained cabinet in order to peer inside. How is this not a search? Officer Leibich's actions are a search in the most basic understanding of the term. Society associates things like shining flashlights into small openings to peer inside as snooping, prying, being nosy, hunting for information. Let's face it, our society abhors this type of behavior, and the Fourth Amendment was enacted to protect against government actors doing these very types of things. Your honors, this case is as simple as the old adage, if it looks like a duck and sounds like a duck, it must be a duck, if you break this case down into three periods of time. First, when Officer Leibich turned from the stove, saw the locked cabinet, the moment he finally was able to see the contents of the cabinet and everything that happened in between those periods of time, which I refer to as the deliberate acts phase. Now, when he first saw this cabinet, the testimony is clear. He was in the house for a minute or less. The smell of the gas was still quite strong. He was unaware of the status of my client. And at this point, the testimony and direct on cross are clear on pages 79 and 87 that when he turned, all he saw was the closed and locked cabinet. Looking at the plain view doctrine specifically at this point, he's legally in the kitchen because his actions have not exceeded the scope of the community caretaking doctrine that allowed him in. But he couldn't see anything, so the plain view doctrine doesn't apply. Next, going to the deliberate acts phase. This, again, is the period of time, however long, that Officer Leibich did all the things that he had to do to see what was inside this cabinet. This is when Leibich approaches the cabinet, discovers the gap, investigates it, takes out his flashlight, gets ready to shine it into the cabinet, clicks it on into the cabinet, and positions his body however he had to do to make that observation. As far as how long this period was, the evidence isn't exactly clear, but it was somewhere between an amount of seconds to a minute or so. Counsel, had the source of the gas leak been determined at that time? When he saw the cabinet, when he turned and saw the cabinet, he already secured the stove and saw that it was secured. The fire department told him this was the source of the gas leak. He did his cursory inspection of it, and as he turned to leave, he testified he saw it chained and locked to the kitchen cabinet. So at that time, the gas leak, for what he understood, was secured, but the gas smell was still quite strong, so the danger was still present. And some of his actions, admittedly, do need to be inferred, because his testimony about this time is scant. But the laws of physics are what they are, and they dictate that there has to be some amount of acts that went from turning to see a locked kitchen cabinet to having your flashlight out and shining it into a small gap. Counsel, would it have made a difference in this case if he had not used the flashlight or had not had to use the flashlight to discover what the contents were? Your Honor, in this case, the flashlight is more of a thumb on the scale, so if you take that off, we have less factors to work with. But admittedly, or not admittedly, but there was still some series of acts that he had to go through, to seeing a locked cabinet, to being in a place where he could look into a gap that was an inch or less, as he testified. There had to be something there. So the flashlight shows that that is a deliberate act of removing that flashlight that had nothing to do with the exigent circumstance that allowed him in. And that was exactly the holding in Hicks. Now, this is a direct quote from Hicks, because the State and the Appellate Court took Hicks as meaning touch, not touch. Okay. But that's what Hicks said. I don't know if you answered Justice Overstreet's question, but did you say yes or no in terms of whether using the flashlight, which allowed him to see the contraband, is that the important factor? If he was able to look into the cabinet and see what he saw without the flashlight, would your position be different? My position wouldn't be different, but the argument would be different, because we're arguing that the use of a flashlight is a deliberate act that exposed portions of Casey's apartment which weren't related to the community caretaking event that allowed him in. So to answer that question, the flashlight certainly helps us, but it's not dispositive on this case. It would still not be in plain view if he didn't use the flashlight. And quoting Hicks directly, taking an action unrelated to the objections of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of the respondent's privacy, unjustified by the exigent circumstances that validated his entry. In that case, the deliberate act was touching and moving a turntable, because while everyone with high-end stereo equipment knows, people will look at it. And at that point, the officer was, when he made the first observation, he was within the scope and license. He was still searching for people, guns, evidence of this shooting. But when he decided to pick it up and look at it, that didn't have anything to do with it, and that was where it crossed the line. And it should be noted that during this phase, the period of time between when he saw the cabinet and its contents, there's still no plain view because he still can't see what's inside. Now, similarly, the 2nd District held in People v. Negru that no touching is needed to exceed the scope and license of a community caretaking event. In that case, the officer arguably was executing a duty within the scope and license of what allowed him in. He was protecting a domestic violence victim from her abuser who was in the house. He was escorting her through the house. He didn't touch anything. All he did was view the closet that this woman opened. Now, the 2nd District held that even though that was arguably within the scope and license, it went beyond what was needed to be done. All they had to do was secure the guy in one room. They didn't particularly have to follow her to another one, so that observation was suppressed. Counsel, what's the scope of a police officer's responsibilities when he's acting pursuant to this community caretaking function? Well, you'd have to look at the facts of each individual case. In this case... There was a gas leak, correct? Yeah, there was a gas leak. And once he was told there was no gas leak and he checked the stove, did his community caretaking function end? There's still things that he could have done within that scope. He didn't know the status of my client at that time. He could have assisted with that. But his actions showed that he didn't care about that because he called an officer that was helping him away from that. So now that you've got both officers in this kitchen looking at drugs... But doesn't that indicate your client didn't need any additional services since the officer could leave? At that time, Officer Stanich said that he was still refusing to leave, and the knowledge that he had was that paramedics were concerned for my client's safety. Now, Stanich testified right around two minutes after getting in there and talking with my client. He was called away from him to the kitchen. So... When an officer's looking into a locked cabinet, I'm looking at the picture in your brief. It has chain on it and a lock. Does that indicate that your client intended to keep the contents of that cabinet private? Yes, certainly it does. And so is the officer involved in an investigation when he starts taking a light and looking into the cabinet? Yes, definitely. He's converted his community caretaking role into a criminal investigative role. And it's important to note that after that point, there's no testimony on the record at all as to what he did. He was in the house for 10 to 15 minutes total. We don't know what happened after he called Stanich over, and Stanich went back to my client's room alone for 8 to 13 minutes, and then they left altogether. So Officer Leibich remained in this house for 8 to 13 minutes, in this kitchen apparently, trying to secure these drugs. He was in the house doing his role as a community caretaker for perhaps less than a minute. After that, it was abandoned, and his full devotion was on this. Counsel, does it matter that your client later disavowed that the house was his or that the cabinet was his or that he knew what was in it? How does that factor into your argument? It shouldn't at all because at that point, all the officer knew was that he was looking at a chained and locked cabinet. He didn't know what my client's connection to that was. He hadn't even talked to my client. Evidence suggests that he didn't even talk to him until after they left the house. So it doesn't matter that he eventually, initially on the record, he disavowed any knowledge of the cabinet, but ultimately later in the investigation, he admitted that he knew about it and he had access to it. He was a resident of this house. So that shouldn't factor in because we have to look at the point in time where going to the reveal. Counsel, doesn't that go to the standing issue? Does your client have standing to challenge what happened if it was not his home? It was his residence. You certainly don't have to own a home or rent a home to establish standing for Fourth Amendment violations. Overnight guests at a home have reasonable expectation of privacy, but the main issue with the standing argument is that the state has chosen to raise that for the first time in front of this court. Now, Casey alleged in his motion that led to this, on page 86 and 87 of the common law record, that this was his residence. At that point, it's the state's obligation to prove that this search was reasonable. So if they want to challenge that, it's the state's obligation. But they didn't do that. Looking at page 127 of the record, this is the first line of the state's argument in front of the circuit court. Your Honor, what we have here is, did law enforcement unreasonably search the home of Casey Hadjistad? The next page, does the search of Casey Hadjistad's kitchen fall under a word of the search exception? And it makes sense that they would want to accept that there because they had to rely on that information to prove Casey guilty. Now the state wants to call all that into question and challenge it when, if the court wants to entertain that, the court certainly shouldn't entertain whether or not the state proves guilty beyond a reasonable doubt. So going to the big review, the moment where you can see what's inside this cabinet. It's the only point in time that these items could have been in plain view because they're the only time that you could see them. But as discussed prior, he can't use the legality of his warrantless entry to justify this search because the deliberate acts leading up to the revealing of what was in this cabinet had nothing to do with that exigent circumstance. So what's the moment of big reveal? I'm waiting to hear it. He's got his flashlight out. He's shining it into the reveal. It just means, like, when he can see what's in this cabinet. That's the only point in time where the contents of this cabinet could be considered in plain view. But as discussed prior, the lead-up to it, there were several deliberate acts that had to take place that had nothing to do with this community caretaking event that led to this observation. And your honors also just have to take into consideration what a search is. A search is a government intrusion into a reasonable expectation of privacy. And a reasonable expectation of privacy is one which is subjectively communicated and one that society is willing to accept. Certainly this was subjectively communicated. That can't be disputed. He chained the cabinet shut, and there's a very obvious back line. And that's ironically what drew Officer Liebich to this cabinet, was his own subjective expression of his privacy interests. No one ever suggested that there was any concern with the gas that was coming from the cabinet, correct? Correct. It's on the opposite side of the kitchen as the stove, so there's not really any reason to believe that there's any connection to the gasoline. May I ask you to address the case that I think both sides have cited, the Hicks case? Yes. It's in some ways similar in that, in that case, the police were called because there had been shots fired and it really was a community caretaking idea that they went into an apartment to determine if there was anyone injured. And when they got into the apartment, they saw a bunch of electronic equipment piled up. It had nothing to do with the shots being fired. There they were, appropriately on the scene for community caretaking, and now they saw something else. And the line of demarcation seemed to be that if they had just seen something, like, for example, here in that case, the serial numbers on the electronic equipment, that wouldn't have been a search. That wouldn't have been inappropriate. They were just there. They saw something. In that case, they actually moved things around, moved these pieces of equipment around so they could figure out what they are and what the serial numbers were, et cetera. And that was the line of demarcation in the case. If they just saw the equipment and were able to determine that they were stolen, there would be no problem. It was that they did something beyond just seeing in plain view these pieces of equipment. So how does that fit in your argument? Here the officer and the court believed the officer is appropriately there in the kitchen, and we've seen the picture. This is a foot away. Maybe this is not a big, huge kitchen. This is like about a foot away from the stove on the other side of this cabinet. And the officer says, without doing anything, he saw the syringes and leafing material through the doors of the cabinet. So how does Hicks resolve this case? How is it playing out? I'll start with correcting you on one point. He never testified that he turned and saw what was in this cabinet. He testified specifically that he turned and saw the padlocked cabinet. He couldn't see what was inside. If, to analogize the two searches in Hicks to the two searches here, we'll say we'll take the – well, I guess not search, the observations. So the first observation in Hicks, the officer was executing his duty. He was – he would put himself in a place where he could see the serial numbers of this, but to get to that specific place, he was executing his duties at looking for victims, evidence of this crime, guns, shell casings, anything. So he's standing in that place looking – he can legally be there looking for guns, and this is in plain view. The difference between what happened here is that the officer had to – he saw something that looked suspicious, and he did all of these things in order to expose the view of this cabinet. He didn't see it while he was concerned about my client. He didn't see it while he was concerned about the neighbors or a gas leak or anything. He's looking at the stove. He turns, and we see the pictures. It's a foot – he turns around a foot away, and he sees the court file into this cabinet. Isn't that the same as what happened in Hicks? That's not the – Your Honor, that's not the testimony. In order to see what was in the cabinet, he had to do several deliberate acts that weren't related to the gas leak, and that's what's different about the first observation in Hicks and this one. And I'll pose to this court, there's no meaningful difference between what Officer Leibich did and what Officer Stanich did. The touching of the cabinet isn't what the problem is. It's the fact that they're peering into somebody's private cabinets that don't have anything to do with why they're there in the first place. Counsel, when you use the word peering, it conjures up an image of the officer putting his eye up to the opening. Is that – was that the testimony? I think it's a reasonable inference from the testimony. It's not – he didn't say he had to peer, but we're talking about an inch gap that was on an angle that he couldn't see into without a flashlight, so he had to go through – he had to determine that he couldn't see into it without a flashlight in order to activate the flashlight. So whether that amount of time – I have a question about that because I think – what is this line of demarcation? You know, using a flashlight isn't necessarily prohibited. I mean, is it that if he had looked behind the stove with the flashlight, because that's how he could see behind the stove where the reason is there, and the drugs were there, would we be having this argument? No, total without – based on what you said, that was totally acceptable. And the cases that the State relies upon get to that exact point. There's a lot of cases where flashlights were incidental to the analysis because just in that case they would be using it as part of why they're there, as the scope and license of why they're there. Here the flashlight has nothing to do with that. It only has to do with looking into this cabinet. And he testified that he took it out specifically to look into this cabinet. So to clarify my own mind, your response to Justice O'Brien, it really is that this case is not about the flashlight. No. Okay. The flashlight's a factor that helps us because it is a deliberate act outside of the scope of the exigent circumstances that allow it in there. So the real thrust of your argument is that the officer's viewing of something in the cabinet was beyond the community caretaking. Is that the crux of your argument? Correct. He had to take a series of deliberate acts that weren't related to that community caretaking event in order to expose the contents of that cabinet. And that was the holding in Hicks. And if it was sitting on the cabinet away from the stove, what about that? What if he just saw them there? If he saw them while he was executing his duties as a community caretaker, they would be in plain view. But he didn't see them while he was doing that. He saw them while he was conducting a criminal investigation, after entering a home without a warrant in order to ensure my client and those around him safety. Thank you very much, Counselor. Thank you very much. Thank you very much. Counselor, please. Good morning. May it please the Court. Counsel, I'm Assistant Attorney General Josh Schneider on behalf of the people of the state of Illinois. And I'd like to start with what I think is now the crux of defendant's argument that this was a search subject to the Fourth Amendment, is that the officer acted in a way that was not related to the purpose of his presence in the kitchen. And Arizona v. Hicks rejects that argument squarely. Arizona v. Hicks explained that in every plain view case, the reason that the plain view doctrine seizure cases here would be open view. Counsel, how is the contents of the cabinet in plain view if the officer had to put his eye to the slit in the cabinet and shine a flashlight into the cabinet in order to see the contents? How is that plain view? So I do have an explanation. But first, I want to note that it was defendant's burden to prove that this was a search. And so to the extent that there is silence in the record about what Officer Leibich did or did not do, that doesn't overcome the – that can't demonstrate that the trial court's finding that the drugs were in open view was against the manifest way of the evidence. All we know, and I would invite the Court to go and review that. It's really one-paged testimony from Officer Leibich about what he did. He said that he was inspecting the stove. After he looked at the stove and determined that there didn't appear, I guess, to be any obvious tampering, he turned to leave. When he turned, he saw the cabinet. And I believe it's one sentence that he looked in the cabinet with his flashlight and saw the drugs. There is no testimony about him pressing his eye up against the cabinet. There's no testimony about him contorting his body. For all we know, what he did was this. And that action is what a defendant is trying to unpack through a series of unsupported inferences to make it sound like Officer was contorting his body and taking a – Well, counsel, it's an action to a view that is – I think it was also that it was about one inch or less. That's right. So looking into a space of one inch or less with a flashlight. So it's the taking of those actions in a locked cabinet. Yes. And the reason that that's not – so I'll start with what open view means or plain view means. It means that the officer is able to see it without manipulating anything in the environment. So in Arizona v. Hicks – Well, in Arizona v. Hicks, they don't say moving. They say taking action. Right. But the action that Hicks describes – again, that sort of line of demarcation between what is a search and what's simply an open view or plain view observation. The officers at Hicks have entered that apartment searching for – they're just in a shooting. They're responding to a shooting in the floor below. Someone's been shot in the ceiling. And they go into the apartment upstairs to look for the shooter and to look for more victims, potentially. And the officers, in doing that, see a pile of high-end stereo equipment, and the officer goes and inspects the serial numbers. There's no question that the inspection of the serial numbers, that action of going in, closely examining that small numbers of letters, that's not related to the officer's purpose of being in the apartment. There's no risk that victims – So let's look at the exact language of Hicks, which is taking action unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy, unjustified by the exigent circumstances that validated the entry. So he's there for a very specific purpose, granted, but there's still a high expectation of privacy in a home. There is, absolutely. And the issue of the gas has been resolved. They've identified the source, and sees something that is maybe suspicious or intriguing or interesting, and then takes some actions, doesn't he? To take a closer look in a very small view with a flashlight in a locked cabinet. And isn't that a taking of action pursuant to Arizona v. Hicks? Not within the meaning of Arizona v. Hicks. And I think that, again, the actions that are mostly we're talking about here, leaning in, if that's in fact what he did, turning on his flashlight, if it wasn't already on because he'd been using it to look behind the stove, we just don't know. How could this looking be related to the purpose of his presence? But there's no question that it's not related to the purpose. That's why the question is not whether it's an unreasonable search. If it was a search, then it would be unreasonable because it's not related to his purpose for being there. The question is, was it a search? Because defendants started by arguing that, well, we all know what a search is. A search is snooping or prying or sort of nosiness, but that's not what a search is under the Fourth Amendment. Okay, so this is plain view, then? Yes. And so you're asking us to find that plain view is in a home, cabinet with a chain and a Cadillac with an open space of an inch or less and that requires the use of light to see the inside. So, again, we don't actually have testimony that required the light. We just know the officer used it. He looked, he opened it, but he didn't use the light. So I don't know whether it required that. But I would say under the facts of this case, the trial court's finding was not beyond the manifesto of the evidence that this was an open view. And I take a step back to the definition of what a search is under the Fourth Amendment because a search is, we know, not seeing something that's visible. Even if the thing is only visible through a hole, that's not a search. A search is observing something in a way that violates a reasonable expectation of privacy, either because it's not an open view, someone had to open a door, someone had to move something aside, someone had to turn a piece of equipment to reveal a serial number, or because although the thing is visible, it is an open view, the officer was only able to see that thing. It was only visible because the officer had occupied a vantage that he was not lawfully allowed to occupy, either because by occupying that vantage he violated some property right, or by occupying that vantage he violated some social expectations that were sort of beyond the pale of what a person would be expected to guard against if they wanted to preserve their expectation of privacy. So it all turns on whether there's a violation of a reasonable expectation of privacy. Well, what about the fact that this was padlocked? Sure. Do you think that somebody would have something padlocked if they didn't have an expectation that it was to be targeted? Well, that would certainly show that the person didn't want someone to get in. If I lock a door, I've communicated to the world, I don't want someone coming in here. If I lock a door with a big window in it, I haven't actually preserved my expectation of privacy from what's beyond the door. Really, it's not a question of did he want someone to be able to get into it, it's did he prevent someone from seeing into it. Because a lock just communicates, don't come in here. A lock doesn't actually physically bar a visible space. Mr. Schneider, there clearly was no window pane on this cabinet, and the potentially maximum view is an inch or less. That's right. And so then the question, I guess, is what the defendant would like this court to adopt is that something is not in plain view if it's only visible for a small opening. Regardless of whether the officer pressed his eye against the opening or whether it was visible. Every morning the court comes in and out of this door. When you are approaching the door, if you approach the door from an oblique angle, and the door is only slightly open, you'll be able to see through the door, even though it's a narrow opening. So the fact that an opening is small doesn't necessarily mean that it is a search. It simply means that if the officer is in a position to see through that opening, he has to have occupied that position lawfully. So the first question, though, is whether as the ultimate action. Any manipulation of your view? I mean, that's not a part of it either. It's that if a very small opening is available, then regardless of what other actions are taken? No, no, it's not that. So, again, I guess this is for terms. I don't think there's any argument really at this point that he didn't violate a property interest, that Officer Liebich didn't enter this kitchen without authority, or that he handled the cabinet door. So we're really talking about by looking through this door as he turned to leave the kitchen, did he violate some social expectation of privacy, or an expectation of privacy that society recognizes as reasonable? And that societal expectation of privacy that suffices to make a subjective expectation of privacy reasonable, so that it's protected by the Fourth Amendment, is not simply that it would be rude for someone to look at something, or that it would be snoopy or nosy. It's that it's really beyond the scope of what society would accept. The way that I've been thinking about it, just because there's a surprisingly well-developed body of precedent on it, is public bathrooms, public restrooms. There are lots of people who are observed doing things in a public restroom stall, and so there's a lot of case law talking about how those observations were or were not in violation of a reasonable expectation of privacy based on social expectations. A person in a public bathroom has no property interest, they have no ownership in that public bathroom, and yet when someone goes into a stall and closes and locks the door, they do now have an expectation of privacy that society will respect. But it is not a veil drawn across the entirety of the stall. The person has a reasonable expectation against someone standing on the toilet stall next to them and looking over the partition. But we aren't talking about a public space. We're talking about a private home, and we're also talking about whether or not there's a padlock, a closed cabinet. Well, it's not closed. The trial court credited Officer Liebich's testimony that it was open about an inch. And I know that defendant has— I thought it was the second officer that used something that scooched it open more. Exactly. And the trial court made that—recognized that distinction just as it was in Hicks here, where it said when Officer Liebich looked through the opening and didn't touch anything, that was not a search. However, when Officer Stanislaw then came in from the other side, where he says there's drugs in here, and then when he comes around the cabinet to look, he instinctively pulls the cabinet another inch or so, whatever slack is left of the chain. That was a search, because then he did take an action. He actually interacted physically with the environment to expose something that he was not able to see without having done that. When the officer approached the cabinet initially, was he acting within the scope or the reason that he was there, the community caretaking? So he was leaving the kitchen. He had to go by the cabinet in order to leave? Yes. If you look at the exhibit that we've attached, or included in our brief on the third page, it's this narrow galley kitchen that ends in a death. I've seen that. So the officer goes in to look at the—passes the cabinet, because he didn't notice it going in, passes the cabinet, inspects the stove, and he stops when he's done with that, and he turns to leave. When he turns to leave, he sees the cabinet, and he looks in through the open door. So the question is, if—this court really said in Jones, and it was 2005, the court said if a container is not closed so that it conceals its contents from view, then you have no reasonable expectation of privacy in the contents of that container. And that's, frankly, this case. There's a cabinet. It was not closed all the way. And if someone could see through, albeit the small part that was open, if they could see contraband inside, the person doesn't have a reasonable expectation of privacy. If—when someone comes over to my home, and I don't want them to see various things— Counsel, was there any testimony about whether the officer had to—you know, he saw the stove. It was—the source of the gas leak had been resolved, so he turned to leave. Did he have to stop to look into the cabinet, or did he turn and walk out the door? What was the testimony? I don't know. There was no testimony about this at all. And, again, it was defendant's burden to prove that this was a search. All the actions that he's saying, well, we could infer that there were these actions. Maybe he did those. It was his burden to prove those actions. Well, I'm not really asking about a search, per se. I'm just asking about his action. Did he turn and walk straight out the door, or did he look around and spot the cabinet and then notice what was inside? There's— I don't know if there was testimony to that kind of— There's no testimony. I believe it really is one line of testimony, that he was looking at the stove, and then he turned to leave. When he turned, he saw the cabinet. He looked inside with his flashlight, and he saw the drugs. I don't—and I apologize if I'm kind of verbatim, but it really is extremely limited testimony, because the focus at the suppression hearing really was on the use of the flashlight. That's what defense counsel thought was—made this into a search, was that he used a flashlight. And so he did not explore any of the other factors that might have been relevant to what actions the officer would have had to take to see through this opening. Turning back to our public restroom again, the other circumstance that might make something that, although it's visible, the way the officer occupied the vantage point to make it visible is unreasonable. A good example is Tarantino, the North Carolina case that the defendant relies upon, where the officer had to scale the back of someone's building to reach a second-story porch, then investigate the—he was closely examining the wall until he found about a quarter-inch crack near the floor, and then crouched down and looked through that crack. And the court said, you have a reasonable expectation of privacy against someone doing that. That is sort of the equivalent of someone standing on the toilet in the adjoining stall looking over the partition. But a person does not have a reasonable expectation against someone seeing through their front window. If someone is lawfully in your home, you may prefer that they not look into your open medicine cabinet because it's rude, but you have a reasonable expectation of privacy that they won't if you didn't close the cabinet. And the fourth limit doesn't protect against rudeness or nosiness. It protects against violations of reasonable expectations of privacy, where you have done what needs to be done to prevent someone from seeing something, and then they take some action that allows them to see it. Here, the cabinet, for whatever reason, was left ajar about an inch. The officer was able to see through that inch opening and saw the drugs, and what the court found as a factual matter was an open view. And the defendant failed to show that that finding was against the manifest way of the evidence. I would also take a step back and note that before you can have a reasonable expectation of privacy, you have to have a subjective expectation of privacy. And at the suppression hearing, the defendant presented no evidence he had any interest in the townhome, the kitchen, or the cabinet whatsoever. And that was the place for him to show that he had an interest in this property so that he could have a subjective expectation of privacy in the property that the court could then evaluate for reasonableness. Now, a defendant has argued that, well, if you're going to say that he didn't show any interest there, that maybe there was a sufficiency problem. But that confuses the two different stages of the proceedings. At the suppression hearing, it was the defendant's burden to prove that he had a subjective and reasonable expectation of privacy that was violated by officer's leadership actions. At trial, he then stipulated that there were evidence. This concept of a protection against rudeness, you know, a neighbor or a person entering your home, we're talking about a police officer. And so it's not just a rudeness issue. It's a protection of your rights because the pursuit of this nosiness or rudeness results in a criminal, in this case, conviction. Yes. So it's a different thing for a police officer than a neighbor. It isn't once the officer is allowed to be there. And that's the way that this court and the U.S. Supreme Court has talked about an officer's observation of things in plain view. So if a person, if a civilian who's in this situation is allowed to look at a camera, a bombaccino, this court's conceding a bombaccino. An officer approaches the house. He's on private property. He approaches the house. He's looking for a suspect. And as he's walking back from the house, there's a car in the private drive. And he looks with a flashlight into the car and sees a bloody baseball bat. And the court said, well, any other person who's in that position would be allowed to look in the car. So again, isn't a car a drastically different situation? And I think illuminating what's visible in a car in a public space that would be visible during the day and would not be visible at night unless you used a flashlight, that's a different situation. I don't believe it was a public space. I believe it was a private drive. So the officer entered private property and looked through this window. But the point was that if a non-officer is allowed to look in this direction, if they're in this space, an officer is not prohibited by the Fourth Amendment from looking in that direction just because he's an officer. So if I was in this person's kitchen and I noticed that the cabinet is open an inch and I'm allowed to do this, there's no tort liability, there's no criminal liability for doing this and looking through the opening. An officer in that same circumstance is also allowed to do that, even though it's not related to the officer's purpose for being there because that's exactly what Hicks said, there is always going to be a disconnect between plain view and an officer's purpose for being there, because that's what plain view doctrine is for. And being allowed to do it as a public person or as a police officer is one thing, but then seizing the items is another piece. Exactly. The plain view doctrine involves seizure. Open view is just the observation. To seize something as plain view doesn't have to just be an open view, but its contraband nature has to be probable cause has to be immediately apparent that it is in fact contraband. But just seeing it doesn't require that sort of work. So here, defendant failed to bear his burden of proving that he had a subjective interest in the townhome, the kitchen, or the cabinet. Then he failed to show that Officer Levitch actually did anything other than simply looking, which Arizona v. Hicks says just looking is not a search under the Fourth Amendment. So because he failed to show the officer actually did anything that encroached or violated a reasonable expectation of privacy, the officer simply looked somewhere that he would have preferred the officer did not look, but did not prevent the officer or anyone else from looking. He failed to prove he had a reasonable expectation of the privacy that was violated by Officer Levitch's actions. So I suppose unless there are any further questions. Is there any concern that, you know, based on the fact that the officer had already been told the gas leak's been fixed, he turns around, he sees it, but then he calls the other officer in. So now not only is this not related to the community caretaking function, but in fact they really sort of abandoned it because the person that they were there to ensure the safety of was still in the home, and he tells the other officer who's attending to him, come here, I've got something to show you. So now this has nothing to do with community caretaking. So I want to address the two parts of that. First, the factual basis, and second, what relation that has to the reasonableness of the observation, whether it's a plaintiff observation, if I may use my answer. First, I think there's been some confusion about what actually happened when the officers entered and what they knew. The two officers arrive. Officer Levitch is told that there's a gas leak we believe is coming from a stove in the kitchen. He enters and turns and goes directly to the kitchen where he starts looking at the stove. Officer Stanislaw enters, and he is told that there's a man in one of the bedrooms. We want him, we're going to get him outside. We're concerned he's been breathing gas all night. Can you help us get him outside? Officer Levitch said that he didn't know there was anyone in there. He was not aware of anyone there. It was Stanislaw who learned that information from one of the firefighters. So Officer Levitch, none of his interactions or none of his actions in the kitchen can really be viewed in terms of his knowing there's someone in need of help elsewhere. He does call for Stanislaw to come out of the bedroom to come to the kitchen. That's true. So he knows that the other officer is attending to someone. Well, he knows the other officer is not in the kitchen. He doesn't know what Stanislaw is doing in whatever other room he's coming to see this. Now, I think it's also important to remember that Stanislaw's testimony, they said there's some concern that Stanislaw's testimony was too unrelated or something like that, not standing eggs. Stanislaw's testimony was excluded as a product of unconstitutional search. So we're really only focused on Officer Levitch's observation as he turned to leave the kitchen. So if there are no further questions. Thank you very much, Counselor. Counselor, reply. Counsel, can you address what I asked you earlier? What role does the fact that your client disavowed any knowledge with respect to your opponents, just addressing that point, what role does that play? Your client claimed it wasn't his house. He didn't know what the cabinet held. It wasn't his cabinet. He had nothing to do with it. What role does that play? It doesn't really play much of a role. Initial denials of culpability don't have any effect on his original observations. What kind of expectation of privacy would he have in a cabinet that he didn't own, didn't know it was there, didn't have any interest in the contents? Why would he have any reasonable expectation of privacy? He ultimately did admit that he had access to that cabinet, that he knew it was there, and that he was living in that house helping his cousin renovate it. And that goes to a different point about the state of things. Could you just let me clear this up? At what point these facts were developed? So at the time of the motion to suppress the evidence, when these issues were being explored and the defendant had a burden here, did he present any evidence then about his knowledge or control over the cabinet then? He alleged in the motion that it was his residence in the state that accepted that allegation. That? That this was his residence in the state. He said that at the hearing, it was agreed that this was his residence. Yeah. Again, the first line of the state's argument is that we are here to determine whether this was a search of Casey's home. The state has never denied any of this until... But just to be clear, at the hearing, everyone agreed that he had control and an expectation of privacy. Yeah. And it was only later then, maybe at trial, that he testified that this was not his home? He had no control? There was evidence that came out. So this was a stipulated bench trial. So they kind of had this hearing knowing that whatever happened at this hearing would end up being evidence at trial. So they had this hearing. They stipulated it to the trial. And then after that, there was proffering of evidence that included these things like Casey's interview afterwards. So the ownership, control, expectation of privacy at the hearing on the motion to suppress, it was the defendant's burden. It met his burden by saying that he had an expectation of privacy in his cabinets because he controlled it, he lived there. Correct? Yes, that's alleged in the motion. And anything about where he denies having control was not introduced during the hearing on the motion to suppress. Is that correct? I believe... I would have to look at the record specifically on that. It might have come in towards the end when they're talking about after they left the house and they got the warrant, because there was testimony kind of surrounding the acquisition of this warrant. So in the motion to suppress, he said, I have no control. That had nothing to do with that cabinet. Therefore, we would say he has no expectation of privacy, which is it? Your Honor, I would have to look specifically at the record to know when it came in. If you want supplemental briefing on that, I can. We can look through it. Are you talking about the statements that he made to the police right at the time of their discovery of what was in the cabinet when he was still taken out of the house? They took him outside and questioned him, and he initially denied having knowledge of it. That's the statement that you think may have come in during the stipulated bench? That may have been part of what the stipulation was, his statements to the police at that time? I believe so, or it came in when they were discussing the warrant, which the circuit court specifically said that it wasn't dealing with anything to do with the warrant. But what we're looking at is the moment that Officer Leibich saw the locked cabinet and when he was able to see inside of it. And really where the state circuit court and the appellate court go wrong is the Fourth Amendment. It doesn't lend itself to bright-blind rules. You can't say, oh, Hicks said, touching is bad, so in this case, touching is bad. The facts are totally different in these cases. Ms. Schumer, counsel indicates that the defendant just failed to establish his burden of proof at the motion to suppress Aaron. And so I'd like to hear from you how your client did, in fact, maintain his burden of proof. He made all of the necessary allegations in his motion. And at that point, it's the state's obligation. He says that it's our burden to prove all this stuff, but it's the state's burden to prove that this search was reasonable. So the state has a burden here, too. They can't just put their hands up and say, oh, there's no testimony that says these specific things, therefore you have to just assume that everything helps us. The state has the burden to prove that this search was reasonable. Now, we allege in the motion that they searched his residence and that it was a violation of his privacy rights. And the state entered its evidence to contest that. It never contested whether or not this was his home. And what about the reasonableness of this inquiry, the actions or inactions taken by the police officer? The defense attorney below questioned him about how he was able to view the items in this cabinet and maintained through her arguments that it was an unreasonable search. I'm not really sure what else defense counsel could have done in that instance. I mean, they argued that the state of this locked cabinet provides a reasonable expectation of privacy. And common sense holds that. The state wants to say that this was an open cabinet and compares it to a car surrounded by windows. But the state itself admits in its bathroom example that there is something different between seeing something from afar and seeing something through a little gap. And they pointed to this door and said, you know, Your Honor, if you open this door and you're sitting where he's sitting, you can see right in. But you wouldn't allow counsel to go up and peer through the gap and see what you're doing in there. And that's the difference here. You can't take this as an open cabinet. If you look at the— May I just really go back to a legal question? Let's be real clear. You filed a motion to suppress evidence. We have a statute. The judge shall receive evidence on any issue of fact necessary to determine the motion. And the burden of proving that the search and seizure were unlawful shall be on the defendant. So do you agree that it was the defendant's burden to present evidence to support the claims here? Yes, and I think that they did. But the state also has a burden that once they make those, to prove that it was unreasonable. So if we prove that— So the concern here is it sounds like, and I could understand that this is, you know, that there was not a lot of evidence in this case. It was not a long hearing. It was not a lot of discovery was done or whatever. It was, you know, a motion to suppress a drug, so things kind of moved quickly. But all the questions we've been asking about what happened, who was where, how far were things, how much time elapsed, what else happened, isn't that the burden of the defendant to present that kind of evidence? And what happens if the defendant does not present that evidence? Then you have to look at the evidence and make reasonable inferences. And you—I mean, I don't think I have to ask the court to take notice of the laws of physics, but to go from turning and seeing a padlocked cabinet to shining a flashlight into it and being able to see what's inside where you couldn't before, there has to be some series of events that happened in order for that to happen. Whether or not they're on the record, that remains true. Now, that could have been taken into consideration at the circuit court, whether or not that evidence was there. So it's not like the circuit court didn't have the ability to make this reasoning. So just because evidence isn't there doesn't mean that something didn't happen. And it's disingenuous to assume that nothing happened. There were several deliberate acts that had to have happened for that officer to go from turning and seeing a clearly locked cabinet to peering through a one-inch gap, shining a flashlight into it. So please bring your remarks to a close. Yes. Your Honor, in closing, at the end of the day, this is a common-sense case. The officers entered with the sole aim to ensure the safety, and they almost immediately are shining a flashlight into a tiny gap and obviously not capping it. That's not what we want our first responders to do. As such, this Court must reverse the circuit court's appellate order holding to find that officer who bridges an investigation into the closed-and-locked cabinet-violated cases worth making. Thank you very much. This concludes this case. Agenda No. 5 of No. 130286, People of the State of Illinois v. Casey Hagestad, will be taken under advisement. Thank you both counselors for your experience.